UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
VINCENT MOSCA,                                                   Civil Action No.: 17-cv-4327-SJF-SIL

                           Plaintiff,

              -   Against -

                                                                SECOND
THE CITY OF NEW YORK, FRANCESCO                                 AMENDED COMPLAINT
COLAVITO, TAPPED 1010 INC., MXL LLC,
and IAN WALSH,                                                   Jury Trial Demanded

                           Defendants.
-----------------------------------------------------------------X

              Plaintiff, by his attorneys, LIPSIG, SHAPEY, MANUS & MOVERMAN, P.C., as

and for his Amended Complaint, hereby brings this action under 42 U.S.C. §1983 to redress his

civil and legal rights, and alleges as follows:

## PRELIMINARY STATEMENT

              1.       This is a civil action for monetary damages which the plaintiff seeks

Compensatory and punitive damages, an award of costs, interest and attorney's fees, against the

defendants THE CITY OF NEW YORK ("CITY"), FRANCESCO COLAVITO ("COLAVITO"),

TAPPED 1010 INC. d/b/a THE TAP ROOM ("TAP ROOM"), MXL LLC ("MXL"), and IAN

WALSH ("WALSH"), arising out of the false arrest, false imprisonment, assault, battery, common

law negligence and permanent injuries caused to plaintiff VINCENT MOSCA ("MOSCA") on or

about April 29, 2016.

              2.       On or about April 29, 2016, COLAVITO a member of NYPD, who was

negligently and recklessly hired, trained, retained and supervised by the CITY and the NYPD in

the County of Kings, City and State of New York, acting under the color of state law and acting in

1

concert with convicted  assailant  WALSH, intentionally and willfully subjected MOSCA to, inter alia, false arrest, false imprisonment, intentional, unlawful and substantial restraint, detention, and assault and battery without just cause in violation of MOSCA's rights under the United States Constitution and 42 USC §1983 and 1988.

   3.   At the time of this incident, COLAVITO was a state actor, acting under color of state law, when he committed these acts, and in doing so deprived MOSCA of the rights, privileges and immunities secured for him by the United States Constitution, the laws of the United States, the New York State Constitution and the laws of the State of New York.

   4.   On and prior to April 29, 2016, CITY and NYPD acted negligently and with reckless disregard for public safety in the screening, hiring, training, retention and supervision of COLAVITO, who CITY and NYPD knew or should have known was completely unfit for duty, and thus caused the false arrest, false imprisonment, intentional, unlawful and substantial restraint, detention, and assault and battery without just cause in violation of MOSCA's rights under the United States Constitution and 42 USC §1983 and 1988.

   5.   On and prior to April 29, 2016, CITY, through and including NYPD, maintained and exercised an official policy or custom which deprived MOSCA of the rights afforded him under the United States Constitution, the laws of the United States, including but not limited to 42 USC §1983 and 1988, the New York State Constitution and the laws of the State of New York, in that NYPD maintained a well-documented custom and practice in which favors were granted to help certain disqualified, and possibly dangerous candidates become NYPD police officers.[1]

---

[1] See https://nypost.com/2018/05/26/nypd-cop-accused-in-road-rage-beating-never-should-have-been-hired/?utm_campaign=iosapp&utm_source=mail_app

6. NYPD's negligent custom and practice of screening, hiring, training, retention and supervision of its police officers is well-documented. This NYPD custom and practice included the issuance of requests by NYPD chiefs and other senior officials to help friends or relatives overcome hiring obstacles, and/or to have NYPD decisions deeming a candidate for police officer unqualified or disqualified overturned.

7. An incident reported on May 26, 2018 involved an event very similar to the one in this case. The NYPD officer in that incident was, like COLAVITO here, off-duty when, in a fit of road rage, he flashed the illegally installed lights and siren on his personal vehicle on another vehicle he was trying to pass, rear-ended it, pistol-whipped the other driver while stating, "Don't you know who I am?" He then sped off, with the other car in pursuit, then slammed his brakes and backed his vehicle into the other car, and then fled.

8. The officer involved in this published article had been deemed a "high risk," and unsuitable to be hired as a NYPD officer three years before, in 2015, and thus prior to the April 29, 2016 at issue in the present case. This "unsuitability" decision was based on a December 2014 psychological evaluation that concluded that the officer lacked "anger management" and had a "tendency to behave in an impulsive, reckless and careless fashion." The evaluation also concluded that this officer's "propensity to behave and react before thinking raises concerns about the risks he poses to himself, his prospective partner(s) and the larger community."

9. Also in this officer's personnel file was evidence of a 2012 incident where the officer, then an NYPD auxiliary police officer, was suspended five days for confronting a traffic agent who gave him a parking ticket, for improperly flashing his badge, and for having previously gotten into "more than 10" physical altercations.

3

10. However, nine days after this "unsuitability" decision, an NYPD supervisor overturned the rejection, and gave the officer a "glowing endorsement," in part due to the officer's auxiliary supervisor, who called him "a professional," "a really good kid," and "always willing to help out." An NYPD whistleblower thereafter charged that the officer '"never should have been hired', saying the fix was in." While normally, when evaluations like this reached opposite conclusions, a third person would interview the candidate "to break the tie," in this instance the same supervisor who overturned the initial rejection conducted the third evaluation.

11. NYPD insiders thereafter blamed "an unfair system in which favors are granted to help certain disqualified – and possibly dangerous – candidates become NYPD cops." Other former NYPD detective sergeants acknowledged that "[t]his isn't the first time I've heard about people who had questionable backgrounds get pushed through the system."

12. In another published similar set of incidents, the former head of the NYPD Detective Bureau investigations unit from 2012 to 2014 admitted having seen "firsthand that high ranking NYPD officials routinely meddled in internal probes and cops with the right connections often got special treatment. Chiefs and other cops above his pay grade often pressed him to close his cases prematurely or curtail investigations of favored officers."[2] These chiefs often overturned recommended punishment for cops "who had juice" or influence, and the former Detective Bureau investigations unit head concluded that the system was "arbitrary and capricious," a conclusion affirmed by NYPD Detectives Union head Michael Palladino, who noted that interference happens "because top brass are in complete control of the system."

---

[2] *See https://1.next.westlaw.com/Document/Ibd0b10b027ab11e8a79ef54450f9ebf9/View/FullText.html?navigationPath=S earch%2Fv1%2Fresults%2Fnavigation%2Fi0ad7403500000164134fc080b289a338%3FNav%3DNEWS%26fragm entIdentifier%3DIbd0b10b027ab11e8a79ef54450f9ebf9%26startIndex%3D1%26contextData%3D%2528sc.Search %2529%26transitionType%3DSearchItem&listSource=Search&listPageSource=65da88ee8f249236f35e9a46d178d a93&list=NEWS&rank=2&sessionScopeId=06c5d9a570abf3651a14915f58f27336ee59f79d7a02227fcb0b405f9567 5202&originationContext=Search%20Result&transitionType=SearchItem&contextData=%28sc.Search%29*

4

13.     This published account documented evidence of other similar incidents, including one involving another off-duty detective who had fired his gun in New Jersey under questionable circumstances, on whose behalf an Internal Affairs Bureau officers recommended a promotion, which was declined by the same former Detective Bureau investigations unit head. After the case was published by media sources, the Internal Affairs Bureau officer, and four other chiefs who also pushed for the officer's promotion, ceased the promotion request.

14.     NYPD's custom and practice as detailed above establishes that on and prior to April 29, 2016, CITY and NYPD acted negligently and with reckless disregard for public safety in the systematic failure to properly screen, hire, train, retain and supervise its police officers, especially with regard to off-duty incidents.  This very custom and practice to hire and retain officers that were clearly unfit for duty here resulted in the false arrest, false imprisonment, intentional, unlawful and substantial restraint, detention, and assault and battery without just cause in violation of MOSCA's  rights under  the  United  States Constitution and 42 USC §1983 and 1988.

15.     On or about April 29, 2016, defendants TAP ROOM and MXL failed to provide reasonable and adequate control, supervision, and security at the premises, thereby causing, contributing and/or allowing COLAVITO to intentionally and willfully act in concert with WALSH and subject MOSCA to, inter alia, false arrest, false imprisonment, intentional, unlawful and substantial restraint, detention, and assault and battery without just cause.

16.     On or about April 29, 2016, defendants THE TAP ROOM and MXL engaged in the unlawful commercial sale of alcohol to intoxicated persons in violation of Section 65 of the New York State Alcoholic Beverage Control Law, thereby causing and contributing to COLAVITO intentionally and willfully acting in concert with WALSH to subject MOSCA to,

5

inter alia, false arrest, false imprisonment, intentional, unlawful and substantial restraint, detention, and assault and battery without just cause.

## JURISDICTION AND VENUE

17.     This action is brought pursuant to 42 USC §1983 and 1988, and the First and Fourteenth Amendments to the United States Constitution.  Jurisdiction is conferred up on this Court by 28 U.S.C. §1331 and 1343, this being an action seeking redress for the violation of MOSCA's constitutional and civil rights.

18.     Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and as against all parties that are so related to the claims in this action within the original jurisdiction of this Court that they form part of the same case or controversy.

19.     Venue in this District is proper under 28 U.S.C. §1391(6) and (c) in that COLAVITO, a member of the New York City Police Department, was primarily screened, hired, trained, retained and supervised by the CITY and the NYPD in the County of Kings, City and State of New York, and the events giving rise to this claim occurred within the boundaries of the Eastern District of New York.

## JURY TRIAL DEMANDED

20.     Plaintiff demands a trial by jury on each and every one of his claims as pleaded herein.

## PARTIES

21.     On or about April 29, 2016, plaintiff MOSCA was a resident of the County of Nassau, City and State of New York. MOSCA was a hedge fund analyst. His father was a

6

battalion chief with the New York City Fire Department.  His mother and other family members had dutifully served in the New York Police Department.

22.     CITY is a municipal entity duly organized under and existing by virtue of the laws of the State of New York.  It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers. Defendant City was at all times relevant herein the public employer of defendant Police Officer COLAVITO.

23.     Defendant COLAVITO was at all times relevant herein a resident of Massapequa, New York, in the County of Nassau, State of New York, and was duly appointed and acting as an officer, servant, employee and agent of the      NYPD, a  municipal  agency  of defendant CITY. At all times relevant herein, COLAVITO was acting under color of the laws, statutes, ordinances, regulations, policies, customs and/or usages of the CITY and of the State of New York and the NYPD, in the course and scope of their duties and functions as officers, agents, servants, and employee of defendant CITY, were acting for, and on behalf of, and with the power and authority vested in them by the CITY and the NYPD, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.  COLAVITO and CITY are sued individually and in their official capacity.

24.     Defendant WALSH was at all times relevant herein, was a resident of Massapequa, in the County of Nassau, State of New York.

25.     By the conduct, acts, and omissions complained of herein, defendants CITY, thorough NYPD, and COLAVITO violated clearly established constitutional standards

7

under the First, Fourth, and Fourteenth Amendments to the United States Constitution of which a reasonable police department and police officer under the circumstances would have known.

26. On or about April 29, 2016, MXL was the landlord that owned, operated, controlled and supervised the premises where the incident occurred, known as 'THE TAP ROOM," at 1010 Park Boulevard, City of Massapequa, State of New York ("the premises").

27. On or about April 29, 2016, TAP ROOM was the tenant that owned, operated, controlled and supervised the premises.

## NOTICE OF CLAIM

28. On July 27, 2016, plaintiff duly served a Notice of Claim upon the CITY and the NYPD, specifying the time when, location where, and manner in which this claim arose, for adjustment.

29. On July 10, 2017, plaintiff duly served an Amended Notice of Claim upon the CITY and NYPD, specifying the time when, location where, and manner in which this claim arose, for adjustment.

30. CITY has wholly failed and refused and refused to adjust or settle this claim.

31. NYPD has wholly failed and refused and refused to adjust or settle this claim.

32. Plaintiff has appeared for his Municipal Hearing Pursuant to New York General Municipal Law §50(h) and met all conditions precedent for the filing of this action.

## STATEMENT OF FACTS

33. Prior to April 29, 2016, CITY and NYPD hired, trained and employed COLAVITO as a New York City Police Officer.

34.     Prior to April 29, 2016, CITY and NYPD hired, trained and employed COLAVITO as a New York City Police Officer despite the fact that was unfit for duty and that retaining him as a Police Officer would pose an undue threat to the health and safety of the general public.

35.     On and prior to April 29, 2016, CITY, through and including NYPD, maintained and exercised an official policy or custom which deprived MOSCA of the rights afforded him under the United States Constitution, the laws of the United States, including but not limited to 42 USC §1983 and 1988, the New York State Constitution and the laws of the State of New York, in that NYPD maintained a well-documented custom and practice in which favors were granted to help certain disqualified, and possibly dangerous candidates become NYPD police officers.

36.     CITY's negligent custom and practice, through NYPD, of screening, hiring, training, retention and supervision of its police officers is well-documented as "an unfair system in which favors are granted to help certain disqualified – and possibly dangerous – candidates become NYPD cops."

37.     NYPD's custom and practice as detailed above establishes that on and prior to April 29, 2016, CITY and NYPD acted negligently and with reckless disregard for public safety in the systematic failure to properly screen, hire, train, retain and supervise its police officers, including COLAVITO, especially with regard to off-duty incidents.  This very custom and practice to hire and retain officers that were clearly unfit for duty here resulted in COLAVITO's false arrest, false imprisonment, intentional, unlawful and substantial restraint, detention, and assault and battery without just cause in violation of MOSCA's rights under the United States Constitution and 42 USC §1983 and 1988.

38.     In particular, upon information and belief, CITY and NYPD knew or should have known that COLAVITO had a history of and a psychological tendency to engage in undue acts of aggressive/violent/bizarre behavior/bullying/alcoholism/mental disturbance and upon information and belief COLAVITO closely associated with persons who engaged in acts of aggressive/violent/bizarre behavior/bullying/alcoholism/substance abuse/mental disturbance and unlawful behavior.

39.     COLAVITO remained unfit for duty after he was hired by the NYPD and CITY failed to retrain him, suspend him, terminate his employment, or otherwise discipline him despite the fact that upon information and belief he continued to engage in undue acts of aggressive/violent/bizarre behavior/bullying/alcoholism/mental disturbance and upon information and belief COLAVITO continued to associate with persons who engaged in acts of aggressive/violent/bizarre behavior/bullying/alcoholism/substance abuse/mental disturbance/unlawful behavior.

40.     On or about April 29, 2016, plaintiff MOSCA visited the restaurant and bar known as the TAP ROOM at the premises.

41.     MOSCA was in the bar a few minutes when he encountered COLAVITO and his close associate WALSH. Both were visibly intoxicated. COLAVITO was on probation with the NYPD at the time.

42.     COLAVITO and WALSH almost immediately and acting in concert, began to menace, threaten, bully, harass and act belligerent towards MOSCA without just cause or provocation.

43.     MOSCA attempted to de-escalate the situation by announcing he was leaving the bar. MOSCA then began to exit.

44.     COLAVITO and WALSH continued to follow MOSCA as he attempted to exit the bar and continued to menace, threaten, bully, harass and act belligerent towards MOSCA without just cause or provocation.

45.     MOSCA further attempted to de-escalate the situation by giving WALSH a friendly hug and wishing him the best.

46.     COLAVITO and WALSH followed MOSCA into the parking lot at the premises and continued to menace, threaten, bully, harass and act belligerent towards MOSCA without just cause or provocation.

47.     The Tap Room and MXL provided no safety or security to MOSCA on the premises or parking lot despite the fact that it was known or should have been known that MOSCA was about to be violently attacked by drunk patrons of the TAP ROOM  and  there was a history of prior violent behavior at the premises.

48.     As MOSCA was attempting to remove himself from the situation and exit the parking lot at the premises, COLAVITO confronted MOSCA.

49.     COLAVITO pronounced: "I'm with the NYPD, you're not going anywhere." COLAVITO further flashed his NYPD badge at MOSCA.

50.     COLAVITO's conduct is very similar to the conduct of NYPD Officer Michael Baror, who in a separate incident, flashed the illegally installed lights and siren on his personal vehicle, rear-ended another vehicle's driver while shouting, "Don't you know who I am? I'm NYPD!"[3]

---

[3] *See Note 1, supra.*

51.     COLAVITO's conduct is also very similar to the conduct of another off-duty NYPD officer who, in 2012, also improperly flashed his badge to a traffic agent who gave him a parking ticket.[4]

52.     While MOSCA was confronted, detained, and distracted by COLAVITO, WALSH viciously punched MOSCA from behind on his head.

53.     WALSH, acting in concert with COLAVITO, continued to repeatedly punch, kick, attack, assault and brutalize MOSCA, while MOSCA lied helplessly and unconscious on the ground in the parking lot.

54.     COLAVITO and WALSH returned back inside to the bar while MOSCA lied helplessly and unconscious on the ground.

55.     COLAVITO and WALSH openly celebrated the unprovoked attack upon MOSCA inside the bar with other patrons as MOSCA lied helplessly and unconscious on the ground in the parking lot.

56.     The TAP ROOM continued to serve alcoholic beverages to COLAVITO, WALSH and other patrons, as a large group engaged in celebratory drinking, high fives, handshakes and mock reenactments of the assault.

57.     The TAP ROOM continued to serve alcoholic beverages ta COLAVITO, WALSH and other patrons, as COLAVITO and WALSH conducted drunk mock re-enactments of MOSCA convulsing on the parking lot floor unconscious.

58.     COLAVITO and WALSH repeatedly, brazenly and openly brought out patrons of the bar into the parking lot in a jovial drunken fashion to mock the condition of MOSCA who remained unconscious and convulsing on the ground.

---

[4] *See Note 2, supra.*

59.     After each such occasion, TAP ROOM continued to serve alcoholic beverages to COLAVITO, WALSH and other patrons, as a large group engaged in celebratory drinking, high fives, hands hakes and mock re-enactments of the assault.

60.     At no point did COLAVITO, TAP ROOM or MXL render any medical assistance to MOSCA or call for any medical assistance.

61.     At no point did TAP ROOM or MXL render any safety or security to MOSCA.

62.     At no point did TAP ROOM or MXL stop serving alcohol to the assailants or their cohorts.

63.     Nearly 10 minutes after the attack, a good Samaritan, Jeffrey Buchheit, came to the assistance of MOSCA.

64.     As a result of the attack, MOSCA suffered a traumatic brain injury, multiple facial fractures, required reconstructive facial surgery and continues to suffer from permanent physical and psychological injuries and for which he remains under active treatment.

65.     Virtually the entire incident was captured on the TAP ROOM'S surveillance video at the premises and on the parking lot.

66.     COLAVITO never reported this off duty incident to the NYPD, in violation of NYPD guidelines.

67.     MOSCA attempted to press charges against COLAVITO and WALSH for the assault and battery with the Nassau County Police Department.

68.     The Nassau County District Attorney charged WALSH with assault but eventually allowed him to plead guilty to a misdemeanor with no jail time.

69.     WALSH had been arrested for a similar assault and battery in the past.

70.     Within a few weeks of the attack, the NYPD learned of the incident and received a copy of the surveillance video depicting COLAVITO and WALSH's brutal assault and battery.

71.     The video alone provided enough evidence that COLAVITO engaged in unlawful criminal behavior, violated numerous NYPD rules and guidelines and was clearly unfit for duty.

72.     Despite this fact, the NYPD continued to engage in an improper systemic failure to hire, retain, retrain, suspend and terminate its employees, by allowing COLAVITO to remain employed with the NYPD for more than one full year after the assault, despite the fact that he was on probation to begin with.

73.     COLAVITO's subsequent NYPD performance evaluation for the period from November 9, 2015 through May 8, 2016, does not address the April 29-30 incident in question, and instead reports that COLAVITO related well with the community and performed up to the standards of the 102 Precinct (Exhibit "A").

74.     Nonetheless, COLAVITO was subsequently terminated by the NYPD effective June 9, 2017, following a telephone interview of COLAVITO performed by NYPD Officer Healy with respect to this incident, and during a period of time that this civil lawsuit was being prepared on MOSCA's behalf and the news media in New York was set to publish the story and surveillance video (Exhibits "B" and "C," at paragraph 10). COLAVITO has asserted that no reason was given for his termination (Exhibit "C," at paragraph 13).

75.     NYPD's negligent conduct in retaining COLAVITO, ignoring the incident in question during COLAVITO's relevant periodic evaluation, and subsequently terminating him only after receiving notice of this impending lawsuit and the publication of a news article and

14

surveillance video, constitutes a continuation of NYPD's negligent custom and practice of "pushing through the system" police officers with questionable – and possibly dangerous backgrounds via an admittedly arbitrary and capricious system of favoritism.

76.    The delay and inaction by the NYPD in effect condoned the heinous conduct of COLAVITO and all the patrons at the bar that night, and further subjected the public to danger and in particular caused further mental anguish and suffering to MOSCA.

77.    The delay and inaction by the NYPD highlights the negligent systemic failure by the NYPD to screen and retain COLAVITO and other similarly situated officers who are clearly unfit for duty and present a danger to the general public.

78.    The CITY OF NEW YORK directly caused the constitutional violations suffered by  MOSCA, and is liable for the damages suffered by MOSCA as a result of the conduct of the defendant COLAVITO. The conduct of COLAVITO was a direct consequence of policies and practices of defendant CITY in failing to institute safe and appropriate measures for the selection, training, hiring, retraining and supervising of police officers.

## FIRST CAUSE OF ACTION

79.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

80.    At the aforesaid time and place, plaintiff MOSCA was unlawfully arrested, detained, and prevented from leaving against his will by Officer COLAVITO who identified himself as an Officer of the NYPD.

81.    At the aforesaid time and place, plaintiff MOSCA was prevented from leaving, punched, struck, kicked, rendered unconscious by the intentional and negligent acts of COLAVITO and WALSH in the parking lot of the "TAP ROOM."

82.     At the aforesaid time and place, Officer COLAVITO, who improperly identified himself as an Officer of the NYPD, acted in concert with WALSH to distract, arrest, detain, and viciously assault MOSCA until and beyond when he was rendered unconscious and incapacitated.

83.     Officer COLAVITO, acting with the authority of the NYPD and under color of badge did at the aforementioned time and place, during his illegal arrest, detention and assault of MOSCA in concert with WALSH cause and allow MOSCA to be beaten until unconscious.

84.     When said Police Officer COLAVITO arrested, detained, distracted and assaulted MOSCA in concert with WALSH, he deprived MOSCA of the rights, privileges and immunities secured to him by the Constitution of The United States and violated 42 USC §1983, et seq.

85.     At the time of this occurrence, Officer COLAVITO's conduct was improperly, illegally, and negligently permitted by a then-existing NYPD custom and practice of "pushing through the system" police officers with questionable – and possibly dangerous backgrounds via an admittedly arbitrary and capricious system of favoritism.

86.     At the time of this occurrence, the conduct of Officer COLAVITO was not justified under the circumstances.

87.     At the time of this occurrence, MOSCA was unarmed and posed no threat to police officers or anyone else.

88.     As a result of Officer COLAVITO's negligence, recklessness and assault and battery of COLAVITO, and the violation of 42 USC §1983, et seq., MOSCA was injured.

89.     The injuries sustained by MOSCA, were due to the negligence, carelessness and recklessness of the defendants COLAVITO, the CITY and the NYPD their agents, servants and/or employees, in violation of 42 USC §1983, et seq.

90.     As a result of the violation of 42 USC §1983, et seq., the physical injuries inflicted upon MOSCA, which included assault and battery, MOSCA claims all damages recoverable under 42 USC§1983, et seq. and the laws of the State of New York, including but not limited to past and future pain and suffering, past and future medical expenses, mental anguish, harm to reputation, embarrassment, ridicule, police brutality, false arrest, assault and battery, attorneys' fees pursuant to 42 USC §1988, and all other items of damage recoverable under New York State Law and the laws of The United States of America.

91.     As a result of the aforementioned occurrence, plaintiff was deprived of his civil rights under the Constitution of the State of New York and the Constitution of the United States, as well as other State ordinances statutes, codes and rules, including 42 U.S.C. 1981, 1983, 1985 and 28 U.S.C. 1343.

92.     Plaintiff was injured.

93.     Plaintiff was seriously injured.

94.     As a result of the foregoing, plaintiff was rendered permanently injured and is entitled to punitive and compensatory damages from the defendants well in excess of $75,000.00.

## SECOND CAUSE OF ACTION

95.     Plaintiff reiterates and re-alleges all of the above paragraphs as if fully set forth herein again.

96.     At all times relevant herein, the NYPD employed COLAVITO as Police

Officer in The New York City Police Department ("NYPD").

97.     At all times relevant herein, the NYPD conducted a background

investigation of Officer COLAVITO as a condition precedent of his employment.

98.     At all times relevant herein, the NYPD conducted psychological testing of

Officer COLAVITO as a condition precedent of his employment.

97.     At all times relevant herein, the NYPD conducted physical-medical

examinations of Officer COLAVITO as a condition precedent of his employment.

98.     At all times relevant herein, the NYPD conducted evaluations of Officer

COLAVITO as a condition precedent of his employment.

99.     At all times relevant herein, the NYPD conducted psychological testing of

Officer COLAVITO as a condition precedent of his employment.

100.    At all times relevant herein, the NYPD conducted required Officer

COLAVITO to attend the New York Police Academy as a condition precedent of his

employment.

101.    At all times relevant herein, the NYPD trained Officer COLAVITO as a

condition precedent of his employment as Police Officer.

102.    At all times relevant herein, the NYPD failed to properly investigate,

screen, evaluate test, train, supervise and examine COLAVITO, and said failures resulted in

COLAVITO becoming a Uniformed Member of the New York City Police Department.

103.    Notwithstanding NYPD's knowledge of the incident in question,

COLAVITO's subsequent NYPD performance evaluation for the period from November 9, 2015

through May 8, 2016, does not address the April 29-30 incident in question, and instead

negligently, carelessly and recklessly reports that COLAVITO related well with the community and performed up to the standards of the 102 Precinct (Exhibit "A").

104.    At all times relevant herein, COLAVITO was unfit to be a New York City Police Officer.

105.    At all times relevant herein, the CITY and the NYPD knew or should have known of COLAVITO'S criminal, aggressive, violent, and abusive tendencies.

106.    At all times relevant herein, the NYPD failed to properly supervise Officer COLAVITO.

107.    The injuries, both physical and psychological, sustained by MOSCA, were due to the negligence, carelessness and recklessness of the defendants, the CITY and the NYPD, their agents, servants and/or employees, in their failures to properly screen for employment, hire, retain, train supervise, and employ, Officer COLAVITO.

108.    The injuries, both physical and psychological, sustained by MOSCA, were due to the negligence, carelessness and recklessness of the defendants, the CITY and the NYPD, their agents, servants and/or employees, in their systemic failure to properly screen for employment, hire, retain, train supervise, and employ New York City Police Officers.

109.    As a result off the foregoing negligence, carelessness and recklessness of the NYPD and CITY, COLAVITO, a member of the New York City Police Department acting under the color of state law and acting in concert with convicted assailant WALSH, intentionally and willfully subjected plaintiff MOSCA to, inter alia, false arrest, false imprisonment, intentional, unlawful and substantial restraint, detention, and assault and battery without just cause in violation of MOSCA's rights under the United States Constitution and 42 USC §1983.

110.    As a result of the foregoing, plaintiff was injured.

19

111.    As a result of the foregoing, plaintiff was seriously injured.

112.    As a result of the foregoing, plaintiff was rendered permanently injured and is entitled to punitive and compensatory damages from the defendants well in excess of $75,000.00.

113.    As a result of the foregoing, plaintiff has been damaged in excess of the jurisdictional limits of all lower courts in which this action could otherwise have been brought.

**THIRD CAUSE OF ACTION - MONELL CLAIM AGAINST
THE CITY OF NEW YORK - 42 U.S.C. §1983**

114.    Plaintiff reiterates and re-alleges all of the above paragraphs as if fully set forth herein again.

115.    The CITY directly caused the constitutional violations suffered by Plaintiff, and is liable for the damages suffered by Plaintiff as a result of the conduct of the defendant officer. The conduct of the defendant officers was a direct consequence of policies and practices of defendant CITY.

116.    At all times relevant to this complaint defendant CITY, acting through the NYPD, had in effect policies, practices, and customs that condoned and fostered the unconstitutional conduct of COLAVITO and other similarly situated officers, and were a direct and proximate cause of the damages and injuries complained of herein.

117.    It was the policy and/or custom of the CITY to inadequately and improperly screen, train, hire and supervise its officers and it was a CITY policy and custom not to investigate citizen complaints of police misconduct, and acts of misconduct were instead tolerated by the CITY, including, but not limited to, the incidents listed above.

118.    It was the policy and/or custom of the CITY of "pushing through the system" police officers with questionable – and possibly dangerous backgrounds via an admittedly arbitrary and capricious system of favoritism.

119.    Prior to April 29, 2016, CITY and NYPD, hired, trained, employed and retained COLAVITO as a New York City Police Officer despite the fact that was unfit for duty and that retaining him as a Police Officer would pose an undue threat to the health and safety of the general public.

120.    CITY's and NYPD's hiring, training, employing and retaining COLAVITO as a New York City Police Officer despite the fact that he was unfit for duty was consistent with the CITY's policy, through NYPD, of "pushing through the system" police officers with questionable – and possibly dangerous backgrounds via an admittedly arbitrary and capricious system of favoritism.

121.    In particular, upon information and belief, CITY and  NYPD knew or should have known that COLAVITO and other similarly situated officers had a history of and a psychological    tendency    to    engage    in    undue    acts    of    aggressive/violent/bizarre behavior/bullying/alcoholism/mental disturbance and upon information and belief COLAVITO closely    associated    with    persons    who    engaged    in    acts    of    aggressive/violent/bizarre behavior/bullying/substance abuse/mental disturbance and unlawful behavior.

122.    COLAVITO remained unfit for duty after he was hired by the NYPD, and CITY and NYPD failed to retrain him, suspend him or terminate his employment despite the fact that upon information and belief he continued to engage in undue acts of aggressive/violent/bizarre behavior/bullying/alcoholism/mental disturbance and upon information and belief COLAVITO

continued to associate with persons who engaged in acts of aggressive/violent/bizarre behavior/bullying/alcoholism/substance abuse/mental disturbance/unlawful behavior.

123.    The video surveillance provided to the NYPD following the subject incident provided more than enough evidence that COLAVITO engaged in unlawful criminal behavior, violated numerous NYPD rules and guidelines, was clearly unfit for duty and should be terminated immediately.

124.    Despite this fact and that COLAVITO was already on probation, the NYPD continued to engage in an improper systemic failure to reasonably and safely hire, retain, retrain, suspend and terminate its employees, by allowing COLAVITO to remain employed with the NYPD for more than one full year after the assault.

125.    Notwithstanding NYPD's knowledge of the incident in question, COLAVITO's subsequent NYPD performance evaluation for the period from November 9, 2015 through May 8, 2016, does not address the April 29-30 incident in question, and instead negligently, carelessly and recklessly reports that COLAVITO related well with the community and performed up to the standards of the 102 Precinct (Exhibit "A").

126.    The system and practice as it came to the hiring and retention of COLAVITO and the continued employment of COLAVITO after the attack is demonstrative of a systematic failure and a custom and practice of the CITY and NYPD to hire and retain officers that are clearly unfit for duty and pose a serious risk to the general public.

127.    The red flags that should have been apparent in the case of COLAVITO as to why he was unfit for duty were ignored based on an established custom and practice that threatens the civil liberties of all members of the public.

128.     The injuries, both physical and psychological, sustained by MOSCA, were due to the negligence, carelessness and recklessness of the defendants, the CITY (through NYPD), their agents, servants and/or employees, in their systemic failure to properly screen for employment, hire, retain, train supervise, and employ New York City Police Officers and their custom and practice to hire and retain police officers that pose a serious threat of danger to the general public.

129.     As a result off the foregoing negligence, carelessness and recklessness of the NYPD and CITY, COLAVITO a member of the New York City Police Department acting under the color of state law and acting in concert with convicted assailant WALSH, intentionally and willfully subjected plaintiff MOSCA to, inter alia, intentional, unlawful and substantial restraint, detention, and assault and battery without just cause in violation of plaintiff MOSCA's rights under the United States Constitution and 42 USC §1983.

130.     As a result of the foregoing, plaintiff was injured.

131.     As a result of the foregoing, plaintiff was seriously injured.

132.     As a result of the foregoing, plaintiff was rendered permanently injured and is entitled to punitive and compensatory damages from the defendants well in excess of $75,000.00.

133.     As a result of the foregoing, plaintiff has been damaged in excess of the jurisdictional limits of all lower courts in which this action could otherwise have been brought.

134.     As a result of the violation of 42 USC §1983, et seq., the physical injuries inflicted upon plaintiff MOSCA, which included assault and battery, MOSCA claims all damages recoverable under 42 USC §1983, et seq. and the laws of the State of New York, including but not limited to past and future pain and suffering, past and future medical expenses, mental anguish,

harm to reputation, embarrassment, ridicule, police brutality, assault and battery, attorneys' fees pursuant to 42 USC §1988, and all other items of damage recoverable under New York State Law and the laws of The United States of America.

**FOURTH CAUSE OF ACTION**

135.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

136.    Defendants COLAVITO's and WALSH's conduct in assaulting and battering the plaintiff without provocation or justification, was extreme, outrageous, and utterly intolerable in a civilized community; conduct which exceeded all reasonable bounds of decency.

137.    Defendant COLAVITO's and WALSH's conduct, described above, was intended to and did cause intentional, severe emotional distress to Plaintiff.

138.    The CITY and NYPD's reaction to the incident as described above in permitting COLAVITO to remain employed for over a year following the incident and the release of the video surveillance to the NYPD was extreme, outrageous, and utterly intolerable in a civilized community; conduct which exceeded all reasonable bounds of decency and was intended to and did cause intentional, severe emotional distress to Plaintiff.

139.    The conduct of the defendants CITY, NYPD, COLAVITO and WALSH was the direct and proximate cause of injury and damage to Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

140.    As a result of the foregoing, Plaintiff was deprived of his liberty, was subjected to serious physical and emotional pain and suffering, and was otherwise damaged and injured.

## FIFTH CAUSE OF ACTION

141.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each preceding paragraph as if fully set forth herein.

142.    On or about April 29, 2016, TAP ROOM, owned, operated, controlled and supervised the premises/business/parking lot known as "THE TAP ROOM" located at 1010 Park Boulevard, City of Massapequa, State of New York.

143.    On and before April 29, 2016 defendant TAP ROOM conducted business at 1010 Park Boulevard, in the City of Massapequa, County of Nassau and State of New York, under the name "THE TAP ROOM".

144.    On or about April 29, 2016, TAP ROOM was an establishment that served food and beverages containing alcohol to the public.

145.    The business so conducted by defendant TAP ROOM, at the aforementioned location consisted of the sale and/or service of, among other things, intoxicating beverages, as authorized and approved by the New York State Liquor Authority and other governmental agencies created for this purpose.

146.    On or about April 29, 2016, TAP ROOM premises included an interior area for service of food and drinks and a parking lot for use by patrons.

147.    On April 29, 2016, COLAVITO and WALSH were served alcoholic beverages by the agents, servants and/or employees of TAP ROOM.

148.    On April 29, 2016, COLAVITO and/or WALSH purchased alcoholic beverages at TAP ROOM.

25

149.     On April 29, 2016, COLAVITO and/or WALSH were served by agents, servants and/or employees of TAP ROOM, such quantities of alcoholic beverages that COLAVITO and WALSH were rendered intoxicated.

150.     On April 29, 2016, defendant TAP ROOM, its agents, servants and/or employees continued to serve COLAVITO and WALSH after said COLAVITO and WALSH were rendered intoxicated.

151.     On April 29, 2016, defendant TAP ROOM, its agents, servants and/or employees continued to serve COLAVITO and WALSH after COLAVITO and WALSH were rendered visibly intoxicated.

152.     On April 29, 20 16, while at TAP ROOM, COLAVITO and WALSH were served intoxicating beverages and/or were illegally sold intoxicating beverages in violation of Section 65 of the Alcoholic Beverage Control Law by said defendant TAP ROOM, its agents, servants and/or employees.

153.     While COLAVITO and WALSH were at TAP ROOM, defendant TAP ROOM, its agents, servants and/or employees knew or had reason to know the intoxicated condition of COLAVITO and WALSH.

154.     When COLAVITO and WALSH were at TAP ROOM, defendant TAP ROOM,  its  agents, servants and/or employees knew or had reason to know the intoxicated condition of COLAVITO and WAL.SH and that same condition caused them to be aggressive, belligerent, violent, and dangerous.

155.     When COLAVITO and WALSH were at the TAP ROOM premises, defendant TAP ROOM, its agents, servants and/or employees knew or had reason to know the intoxicated condition of COLAVITO and WALSH and that same condition caused them to be

aggressive, belligerent, violent, and dangerous which was a cause of the attack by COLAVITO and WALSH on MOSCA as complained of herein.

156.   As a result off the foregoing negligence, carelessness and recklessness of the defendants, and as a result of the alcohol served to them as described above herein, COLAVITO and WALSH, did, without provocation, conspire, collude, plan and thereafter attack and viscously assault MOSCA until and beyond when he was rendered unconscious and incapacitated.

157.   As a result off the foregoing negligence, carelessness and recklessness of the defendants, and as a result of the alcohol served to them as described above herein, COLAVITO, a member of the New York City Police Department acting under the color of state law and acting in concert with convicted assailant WALSH, intentionally and willfully subjected plaintiff MOSCA to, inter alia, intentional, unlawful and substantial restraint, detention, and assault and battery without just cause in violation of plaintiff MOSCA'S rights under the United States Constitution and 42 USC §1983.

158.   Plaintiff was injured.

159.   Plaintiff was seriously injured.

160.   As a result of the foregoing, plaintiff was rendered permanently injured and is entitled to punitive and compensatory damages from the defendants well in excess of $75,000.00.

## SIXTH CAUSE OF ACTION

161.   Plaintiff reiterates and re-alleges all of the above paragraphs as if fully set forth herein again.

162.   On or about April 29, 2016, MXL owned the premises.

163.    On or about April 29, 2016, MXL leased the premises.

164.    On or about April 29, 2016, MXL rented the premises.

165.    On or about April 29, 2016, MXL operated the premises.

166.    On or about April 29, 2016, MXL managed the premises.

167.    On or about April 29, 2016, MXL leased the premises to TAP ROOM.

168.    On or about April 29, 2016, MXL and TAP ROOM had a responsibility to provide reasonable and adequate security at the premises.

169.    On and prior to April 29, 2016, MXL, and TAP ROOM knew or should have known that there was a history of dangerous and unlawful activities taking place at the premises, including prior incidents of fights and attacks on patrons at the premises.

170.    On or about April 29, 2016, MXL, and TAP ROOM knew or should have known of the high risk of crime and violence at the premises.

171.    On or about April 29, 2016, MXL and TAP ROOM, failed to provide adequate security to persons lawfully at the premises, including the plaintiff, despite their knowledge of the high risk of crime/violence at the premises/business/parking lot.

172.    On or about April 29, 2016, plaintiff was a lawful patron on the premises.

173.    As a result off the foregoing negligence, carelessness and recklessness of the defendants TAP ROOM and MXL to provide adequate security at the premises, COLAVITO and WALSH, did, without provocation, conspire, collude, plan and thereafter attack and viscously assault MOSCA until and beyond when he was rendered unconscious and incapacitated.

174.    As a result off the foregoing negligence, carelessness and recklessness of the defendants TAP ROOM and MXL to provide adequate security at the premises, COLAVITO, a member of the New York City Police Department acting under the color of state law and

acting in concert with convicted assailant WALSH, intentionally and willfully subjected plaintiff MOSCA to, inter alia, false arrest, false imprisonment, intentional, unlawful and substantial restraint, detention, and assault and battery without just cause in violation of plaintiff MOSCA's rights under the United States Constitution and 42 USC §1983.

175.   As a result off the foregoing negligence, carelessness and recklessness of the defendants TAP ROOM and MXL failed to render any medical assistance to the plaintiff whatsoever despite the fact that it was known or should have been known to the TAP ROOM and MXL, that plaintiff remained unconscious for several minutes and was in emergent need of medical aid and assistance.

176.   TAP ROOM and MXL's conduct prior to, during and subsequent to the brutal attack on plaintiff MOSCA, in continuing to serve alcohol to the assailants and cohorts and promote a festive celebration of the attack while the plaintiff remained in dire need of medical treatment,               was extreme, outrageous, and utterly intolerable in a civilized community; conduct which exceeded all reasonable bounds of decency.

177.   Defendant TAP ROOM and MXL's conduct, described above, was intended to and did cause intentional, severe emotional distress to plaintiff.

178.   TAP ROOM and MXL's conduct in promoting such a heinous atmosphere at the bar, was witnessed by numerous members of the plaintiff s community and captured on surveillance video for the whole world to see, causing intentional, severe emotional distress to Plaintiff.

179.   Plaintiff was injured.

180.   Plaintiff was seriously injured.

29

181.    As a result of the foregoing, plaintiff was rendered permanently injured and is entitled to punitive and compensatory damages from the defendants well in excess of $75,000.00.

WHEREFORE, Plaintiff demands the following relief jointly and severally against all of the Defendants:

(a)    Compensatory damages in the amount to be determined by a jury;

(b)    Punitive damages in an amount to be determined by a jury;

(c)    The convening and empaneling of a jury to consider the merits of the claims herein;

(d)    Costs and interest and attorneys' fees.


Yours, etc.

LIPSIG, SHAPEY, MANUS & MOVERMAN, P.C.

By:_____
        MARC E. FREUND
        Attorneys for Plaintiff
        40 Fulton Street
        New York, NY 10038-1850
        (212) 285-3300

## **VERIFICATION**

MARC E. FREUND, an attorney duly admitted to practice law in the State of New York, affirms the following under penalty of perjury:

I am a member with the law firm of LIPSIG, SHAPEY, MANUS & MOVERMAN, P.C., attorneys for the plaintiff herein.

I have read the foregoing Amended Verified Complaint and know the contents thereof, and upon information and belief your affirmant believes the matters therein alleged to be true.

The reason this verification is made by your affirmant and not the plaintiff herein is that plaintiff herein resides in a county other than that in which your affirmant maintains his offices.

The source of your affirmant's information and the grounds of his belief are communications, papers, reports and investigations contained in the file for this matter.


DATED: New York, New York
      June 18, 2018

                                           _____
                                              MARC E. FREUND